IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MONTANA

BUTTE DIVISION

| | |
|---|---|
| MONTANA FAIR HOUSING, INC.,<br><br>          Plaintiff,<br><br>   vs.<br><br>CITY OF BOZEMAN,<br>ANDY EPPLE, VICKI HASLER,<br>and the HINESLEY FAMILY<br>LIMITED PARTNERSHIP #1,<br>HINESLEY DEVELOPMENT<br>and CHARLES W. HINESLEY,<br><br>          Defendants. | CV 09-90-BU-RFC-CSO<br><br><br>**FINDINGS AND<br>RECOMMENDATION OF<br>UNITED STATES<br>MAGISTRATE JUDGE** |

Plaintiff Montana Fair Housing, Inc. ("Fair Housing") claims that Defendants City of Bozeman, Andy Epple, and Vicki Hasler (collectively "Bozeman") violated state and federal laws prohibiting housing discrimination against persons with disabilities or based on age and marital status. *Complaint (Court Doc. 1), ¶ 1.* Fair Housing also alleges that Bozeman violated state laws respecting building codes, access to public records, and personal privacy protection. *Id.* Fair

1

Housing seeks "declaratory, injunctive, and affirmative relief[,]" compensatory and punitive damages, costs, and attorney fees. *Id., ¶ 2.*

Pending is Bozeman's motion for summary judgment challenging Fair Housing's standing to pursue this action. *Court Doc. 101.* Also pending is Fair Housing's motion for partial summary judgment. *Court Doc. 92.* Because Bozeman's motion challenges Fair Housing's standing, the Court addresses it here first. The Court will address Fair Housing's motion by separate order.[1]

## I. <u>BACKGROUND</u>

The parties disagree with one another's characterization of many background facts. *Compare Bozeman's Stmt. of Undisputed Facts (Court Doc. 103) with Fair Housing's Stmt. of Genuine Issues (Court Doc. 117).* Many of the facts about which they disagree are not strictly material to the Court's consideration of the motion at hand. The Court's recitation of the facts here is intended neither to be exhaustive of every fact nor conclusive on every issue in dispute. Rather, it is

---

[1]On May 25, 2010, Judge Cebull referred this case to the undersigned for pretrial purposes pursuant to 28 U.S.C. § 636(b)(1), including submission of proposed findings and recommendations. *Court Doc. 33.*

intended to place the parties' dispute in context.

A.  **The Parties**

1.  **Fair Housing**

Fair Housing is a Montana nonprofit corporation.  *Court Doc. 1, ¶¶ 1, 10(a); Bozeman Defts' Stmt. of Undisputed Facts (Court Doc. 103), ¶ 1; Fair Housing's Stmt. of Genuine Issues (Court Doc. 117), ¶ 1(a).* Among its stated purposes and goals are "the promotion of equal opportunity in the sale and renting and availability of housing and elimination of all forms of illegal housing discrimination in the state of Montana."  *Court Doc. 1, ¶ 10(b).*

Fair Housing's stated past and present activities in Bozeman include:  "(a) counseling persons in need of housing regarding their right to equal housing opportunities and the location of housing available on a nondiscriminatory basis … ; (b) investigating allegations of discrimination and conducting investigations of housing accommodations to determine whether the housing is available on an equal opportunity basis … ; (c) taking such steps as necessary to assure equal opportunity, and to counteract and eliminate discriminatory

housing practices, ... ; (d) providing outreach and education to the public, housing providers and housing consumers regarding fair housing, ... ; (e) identifying housing that is available on a nondiscriminatory basis and distributing that information to various organizations, agencies and persons seeking housing opportunities that are accessible and available on a nondiscriminatory basis, ...; and (f) identifying, providing information to, and training [ ] housing providers and public and private agencies in methods of preventing or curing discriminatory practices, ...." *Id., ¶ 1(c).*

Fair Housing is governed by a board of directors. Pamela Bean ("Bean") is its executive director. Fair Housing is not a "membership organization." It has no members. *Court Doc. 103, ¶ 2; Court Doc. 117, ¶ 2.*

In addition to suing Bozeman in this action, Fair Housing also originally named as Defendants the Hinesley Family Limited Partnership #1, Hinesley Development, and Charles W. Hinesley (collectively the "Hinesleys"). Fair Housing and the Hinesleys previously agreed to entry of a consent order and corresponding

judgment pursuant to settlement.  *See Court Docs. 68, 69, 80, 81, and 82.*  Neither the settlement, Consent Order, nor Judgment included Bozeman.

### 2. <u>The Hinesleys</u>

The Hinesleys are real property owners and developers.  *Court Doc. 103, ¶ 3.*  They "were substantially involved in designing and constructing the Hinesley Properties[,]" known as "Aiden Condos I" and "Aiden Condos II" in Bozeman.  *Supplement to Scheduling Order (Court Doc. 32), STIPULATIONS, ¶¶ 2(a) and 2(I).*

The Hinesley Properties are comprised of "dwellings" as that term is defined in the Fair Housing Act, 42 U.S.C. §§ 3601 *et seq.*, and are "housing accommodations" as that term is defined in the Montana Human Rights Act, Mont. Code Ann. Title 49.  The ground floor units of the Hinesley Properties contain "covered multifamily" dwellings and housing accommodations as those terms are defined under federal and state fair housing laws.  *Court Doc. 32, ¶ 2(d).*

### 3. <u>Bozeman</u>

Defendant City of Bozeman is a political subdivision and

municipal corporation of the state of Montana as defined in MCA § 7-1-4121 and a local governmental agency as defined by MCA § 49-3-101(4). *Id., ¶ 2(e)*. Defendant Andy Epple is the Director of Planning and Community Development for the City of Bozeman. *Id., ¶ 2(f)*. Defendant Vicki Hasler is the code enforcement officer for the City of Bozeman. *Id., ¶ 2(g)*. Epple supervised, ratified, and otherwise participated in Hasler's code enforcement activities. *Id., ¶ 2(f)*.

## B. Bozeman's Involvement with the Hinesley Properties

The Hinesley Properties were designed and constructed for first occupancy after March 13, 1991. *Id., ¶ 2(c)*. The design and construction were completed before November 2008. *Id., ¶ 2(k)*.

The Hinesleys submitted building permit applications to Bozeman, which issued building permits in accordance with the applications. *Id., ¶ 2(s)*. At various times prior to November 2008, Bozeman inspected the design and construction of the Hinesley Properties for residential occupancy and subsequently issued certificates of occupancy. *Id., ¶ 2(l)*.

## C.   Fair Housing's Involvement with the Hinesley Properties

Before initiating this lawsuit, Fair Housing monitored construction of multi-family dwellings for compliance with the federal Fair Housing Act. *Court Doc. 103, ¶ 9.* It requested from Bozeman lists of building permit applications and certificates of occupancy. Bozeman provided the lists. *Id.*

In 2006, the Hinesley Property appeared on the list. *Id. at ¶ 10.* Fair Housing sent the Hinesleys a letter in January 2006 advising them of the need to comply with the Fair Housing Act and offering assistance. Fair Housing sent the Hinesleys a similar letter in September 2006. *Id.*

On October 16, 2008, Bean conducted an external visual inspection of the Hinesley Property. *Id. at ¶ 11.* She investigated and took photos. She noted several exterior violations of design and construction requirements under state and federal law. *Id.; see also Court Doc. 117, ¶ 11.*

At the time of Bean's inspection, Bozeman had not yet issued a certificate of occupancy to the Hinesleys. Bean did not notify Bozeman

or the Hinesleys of the violations she had observed before construction concluded and certificates of occupancy were issued. *Court Doc. 103, ¶ 12.*

Fair Housing sent a tester to the Hinesley Property on February 17, 2009. *Id., ¶ 13.* The tester posed as a potential renter or purchaser, gained entrance to the interior of the property, and noted various violations of fair housing requirements, which were reported to Fair Housing. *Id.*

On April 9, 2009, Fair Housing wrote to the Hinesleys and demanded remediation of the noncompliant features of the property. *Id., ¶ 14.* It copied the letter to Bozeman. *Court Doc. 117, ¶ 14.* Fair Housing demanded "reimbursement of all costs [Fair Housing] has incurred to date, and any future costs incurred in our effort to ensure the development owners correct deficiencies, deficiencies in other developments completed by the owners, and deficiencies in any future developments." *Court Doc. 103, ¶ 14.* Fair Housing represents that neither the Hinesleys nor Bozeman took action in response to their April 9, 2009 letter. *Court Doc. 117, ¶ 14.*

On June 10, 2009, Fair Housing filed a "Complaint of Housing Discrimination" with the Montana Human Rights Bureau against Bozeman and the Hinesleys. *Id., ¶ 15.*

On March 1, 2011, a Consent Order was entered between Fair Housing and the Hinesleys. *Court Doc. 69.* Judgment was entered on April 20, 2011, in favor of Fair Housing and against the Hinesleys. *See Court Doc. 81.* The parties disagree on the effect of the Consent Order and Judgment. *Compare Court Doc. 103, ¶¶ 16-17 with Court Doc. 117, ¶¶ 16-17.*

### D.  Bozeman's Enactment and Enforcement of a Zoning Ordinance

Bozeman adopted Ordinance § 18.80.1390 and publishes it to the community. It last amended that ordinance in 2000. *Court Doc. 32, ¶¶ 2(o),(u).*

Bozeman City Ordinance § 18.16.020, "Authorized Uses," effective August 2009 and during periods relevant to this action, states:

> Uses in the various residential districts are depicted in the table below. Principal uses are indicated with a "P", conditional uses are indicated with a "C", accessory uses are indicated with an "A" and uses which are not permitted within the district are indicated by a "–."

| Table of Residential Uses | R-S | R-1 | R-2 | R-3 | R-4 | R-0 | RMH |
|---|---|---|---|---|---|---|---|
| Assisted Living/Elderly Care Facilities | – | – | – | C | C | P | – |
| Community residential facilities (more than 4 residents) | C | C | C | P | P | P | C |
| Cooperative Housing | C | C | C | P | P | P | C |
| Fraternity & Sorority Houses | – | – | – | C | P | P | – |
| Single-household dwelling | P | P | P | P | P | P | P |
| Two-household dwelling | – | – | P | P | P | P | – |
| Three or four household dwelling | – | – | – | P | P | P | – |

*Id., ¶ 2(p).*

An "Assisted Living Facility" ("ALF") is intended to provide housing opportunities for persons with disabilities and the elderly (MCA § 50-5-101(7)). *Id., ¶ 2(q).*

Bozeman adopted the 2006 International Building Code ("IBC") for regulating the erection, construction, occupancy and use of all buildings within Bozeman and providing Bozeman with the standard for the issuance of permits and certificates of occupancy. *Id., ¶ 2(r).*

Questions arose concerning some provisions of the ordinance, including definitions of some terms. Fair Housing and Bozeman communicated with one another about the questions beginning in 2003 or 2004. *Court Doc. 103, ¶¶ 20-22; Court Doc. 117, ¶¶ 20-22.*

Ultimately, Fair Housing filed a Complaint against Bozeman with the Montana Human Rights Bureau in connection with the ordinance. *Court Doc. 103, ¶ 23; Court Doc. 117, ¶ 23.*

## E. <u>Fair Housing's Claims Against Bozeman</u>

In its Complaint in this action, Fair Housing makes the following claims against Bozeman:

Count III: Bozeman is liable for violating the Fair Housing Act, 42 U.S.C. §§ 3601, et seq., *Court Doc. 1, ¶¶ 73-75*;

Count IV: Bozeman is liable for violating the Americans with Disabilities Act, 42 U.S.C. §§ 12131, et seq., *id., ¶¶ 76-78*;

Count V: Bozeman is liable for violating § 504 of the Rehabilitation Act, 29 U.S.C. § 794, *id., ¶¶ 79-81*;

Count VI: Bozeman is liable under 42 U.S.C. § 1983 for denying due process and equal protection to persons because of disability, age, or marital status in violation of the Fourteenth Amendment to the U.S. Constitution, *id., ¶¶ 82-84*;

Count VII: Bozeman is liable for violating the Montana Human Rights Act, including MCA §§ 49-2-302 and -305, *id., ¶¶ 85-88*;

Count VIII: Bozeman is liable for violating the Montana Governmental Code of Fair Practices, MCA §§ 49-3-204 and -205, *id., ¶¶ 89-91*;

Count IX:       Bozeman is liable for violating state building codes, *id.,*
                *¶¶ 92-96*;

Count X:        Bozeman is liable for violating Art. II, sec. 10, of
                Montana's Constitution, *id., ¶¶ 97-98*; and

Count XI:       Bozeman is liable for violating Art. II, sec. 9, of
                Montana's Constitution, *id., ¶¶ 99-101*.

Fair Housing seeks declaratory and injunctive relief,

compensatory and punitive damages, costs, and attorney's fees. *Id., ¶¶*

*A-G*.

## II.    <u>SUMMARY JUDGMENT STANDARD</u>

"The court shall grant summary judgment if the movant shows

that there is no genuine dispute as to any material fact and the movant

is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "[A]

party seeking summary judgment always bears the initial

responsibility of informing the court of the basis for its motion, and

identifying those portions of 'the pleadings, depositions, answers to

interrogatories, and admissions on file, together with the affidavits, if

any,' which it believes demonstrate the absence of a genuine issue of

material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

Material facts are those which may affect the outcome of the case.

*Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986). A dispute as to a material fact is genuine if there is sufficient evidence for a reasonable fact-finder to return a verdict for the nonmoving party. *Id.*

Entry of summary judgment is appropriate "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp.*, 477 U.S. at 322. "A moving party without the ultimate burden of persuasion at trial – usually, but not always, a defendant – has both the initial burden of production and the ultimate burden of persuasion on a motion for summary judgment." *Nissan Fire & Marine Ins. Co. v. Fritz Companies, Inc.*, 210 F.3d 1099, 1102 (9th Cir. 2000). "In order to carry its burden of production, the moving party must either produce evidence negating an essential element of the nonmoving party's claim or defense or show that the nonmoving party does not have enough evidence of an essential element to carry its ultimate burden of persuasion at trial." *Id.*

If the moving party meets its initial responsibility, the burden then shifts to the opposing party to establish that a genuine issue as to

any material fact actually does exist.  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).

To establish the existence of this factual dispute, the opposing party may not rely upon the denials of its pleadings, but is required to tender evidence of specific facts in the form of affidavits, and/or admissible discovery material, in support of its contention that the dispute exists. Fed. R. Civ. P. 56(c); *Matsushita*, 475 U.S. at 586, n.11. The opposing party need not establish a material issue of fact conclusively in its favor.  It is sufficient that "the claimed factual dispute be shown to require a jury or judge to resolve the parties' differing versions of the truth at trial."  *T.W. Elec. Serv.*, 809 F.2d at 631.  Thus, the "purpose of summary judgment is to pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial."  *Matsushita*, 475 U.S. at 587 (quotation omitted).

In resolving a summary judgment motion, the Court examines the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any.  Fed. R. Civ. P. 56(c).  The

evidence of the opposing party is to be believed, *Anderson*, 477 U.S. at 255, and all reasonable inferences that may be drawn from the facts placed before the Court must be drawn in favor of the opposing party, *Matsushita*, 475 U.S. at 587 (citation omitted).

Finally, to demonstrate a genuine issue, the opposing party "must do more than simply show that there is some metaphysical doubt as to the material facts.  Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for trial.'"  *Matsushita*, 475 U.S. at 587 (citation omitted).

## III.  PARTIES' ARGUMENTS

### A.  Bozeman

Bozeman seeks summary judgment on Fair Housing's Counts III-X.  *Court Doc. 102 at 2; Bozeman Defts' Br. (Court Doc. 104) at 3.*  Bozeman did not include Count XI as among the counts for which it seeks summary judgment.  *Court Docs. 102 at 2; 104 at 3; and 122 at 1.*

Bozeman argues that Fair Housing's claims arise from "two separate and distinct sets of facts."  *Court Doc. 104 at 5.*  The first,

which Bozeman refers to as "the Hinesley Claim," relates to its involvement with the Hinesley Properties, including the issuance of building permits, inspection, and issuance of certificates of occupancy. *Id.* The second, which Bozeman refers to as "the Ordinance Claim," relates to "the enactment and enforcement of a Bozeman Zoning Ordinance." *Id.*

Bozeman argues that Fair Housing lacks standing to pursue either the Hinesley Claim or the Ordinance Claim. It maintains that the Court must determine, with respect to each claim, whether Fair Housing: (1) has organizational or representational standing; and (2) may seek damages and/or affirmative relief in either capacity. *Id. at 9-10, 16, 23.* In responding to Bozeman's motion, Fair Housing concedes that it is not asserting representational standing. *Fair Housing's Resp. Br. (Court Doc. 116) at 16, n.2.* Thus, the Court need address only representational standing.

### 1.   <u>Damages for the Hinesley Claim</u>

Bozeman argues that Fair Housing lacks organizational standing to seek damages for the Hinesley Claim. *Court Doc. 104 at 17.* To

establish standing, Bozeman argues that Fair Housing "must prove that it has suffered 'both a diversion of its resources and a frustration of its mission' in addressing the Hinesley Claim" and that it "cannot manufacture its injury by simply incurring litigation costs[,]" which it has done here. *Id.* (citing *La Asociacion de Trabajadores de Lake Forest v. City of Lake Forest*, 624 F.3d 1083, 1088 (9th Cir. 2010) ("*Lake Forest*") and *Fair Housing of Marin v. Combs*, 285 F.3d 899, 901 (9th Cir. 2002) ("*Combs*")).

Bozeman argues that Fair Housing was aware of the Hinesley Property violations in October 2008 when Bean observed and photographed them. *Id. at 17.* Bean knew at the time that Bozeman had not yet issued certificates of occupancy, it argues, but she did not notify Bozeman of the violations or challenge issuance of the certificates of occupancy. Fair Housing instead "sat by and let the certificates of occupancy be issued without the violations being remedied[,]" and "sent a tester to the Hinesley Property to gather more evidence of violations." *Id.*

Bozeman argues that Fair Housing's "strategy was obviously to

secure evidence against Hinesley and Bozeman for use in litigation[ ]" and "was not to avoid the construction and occupancy of multi covered family housing in violation of the [federal Fair Housing Act]." *Id. at 18.* Otherwise, Bozeman argues, Fair Housing would have notified it of the violations and "demanded that the certificates of occupancy not be issued until the violations were remedied." *Id.*

Bozeman also argues that Fair Housing was "motivated by money" and not by "an interest in preventing discriminatory housing practices[ ]" because it was more financially beneficial to Fair Housing to bring this action for damages rather than notify Bozeman of the Fair Housing Act violations and ask that certificates of occupancy be withheld until violations were corrected. *Id.* Bozeman argues that Fair Housing's "resources were diverted to pursue a litigation strategy . . . [and its] mission was frustrated by pursuing that litigation strategy rather than acting to prevent housing discrimination." *Id. at 19.* Thus, Bozeman argues, Fair Housing lacks organizational standing to seek damages for the Hinesley Claim. *Id.*

In addition, Bozeman argues that Fair Housing's damages claim,

if any, is moot.  Bozeman notes that Judgment was entered in April 2011 against the Hinesley Defendants requiring them to pay Fair Housing $58,036.92.  Bozeman argues that Fair Housing "no longer has damages to support its organizational standing claim against" them because that amount reflects 32 percent of Fair Housing's expenses for 2008 and 2009.  Thus, Bozeman argues, Fair Housing "cannot possibly argue that the damages it incurred as a result of the Hinesley Claim exceed $58,036.92." *Id. at 19-20*.

## 2. <u>Affirmative Relief for the Hinesley Claim</u>

Bozeman argues that Fair Housing lacks standing to seek affirmative relief on the Hinesley Claim because Fair Housing cannot make the requisite showing of "a very significant possibility of future harm." *Id. at 20* (citing *San Diego County Gun Rights Committee v. Reno*, 98 F.3d 1121, 1126 (9th Cir. 1996)).  It argues that Fair Housing is seeking a declaration that Bozeman is obligated to enforce fair housing laws and an order enjoining Bozeman from issuing certificates of occupancy for structures not in compliance with such laws.  But, Bozeman argues, there is no evidence to support "a very significant

possibility" that it will not enforce the laws absent declaratory or injunctive relief. *Id. at 20-21*.

### 3. <u>Damages for the Ordinance Claim</u>

Bozeman argues that Fair Housing lacks organizational standing to seek damages for the Ordinance Claim because Fair Housing, instead of demonstrating that it has suffered both a diversion of its resources and a frustration of its mission, "has followed a litigation strategy in connection with the Ordinance Claim the same as it did in connection with the Hinesley Claim." *Id. at 24.* It argues that Fair Housing: (1) knew of the Ordinance in 2003; (2) communicated with Bozeman about it; (3) did not pursue its concern with the Ordinance until January 2004 "because it was not a good use of its resources[,]"; (4) filed a claim against Bozeman with the Human Rights Bureau regarding the Ordinance in October 2009; and (5) did not advise Bozeman of its concern with the Ordinance or the need to change it to comply with fair housing laws for the five years preceding that filing. *Id.*

Bozeman argues that Fair Housing's involvement with the

Ordinance was "extremely limited" before filing its Complaint, having received only a few comments about it and not taking any action in response. *Id. at 25.* Thus, it argues, Fair Housing has suffered no injury other than that "involved in pursuing a litigation strategy." *Id.* It argues that Fair Housing "did not spend any resources on attempts to change or repeal the Ordinance ... [and] made no effort to address concerns of anyone who contacted it regarding the Ordinance." *Id.* For all of these reasons, Bozeman argues, Fair Housing "cannot claim a diversion of its resources or a frustration of its mission." *Id. at 26.*

### 4. <u>Affirmative Relief for the Ordinance Claim</u>

Bozeman argues that Fair Housing lacks organizational standing to seek affirmative relief on the Ordinance Claim because Fair Housing, in asking "the Court to declare the Ordinance invalid and to enjoin Bozeman from enforcing it[,]" is impermissibly seeking an advisory opinion and asking the Court to decide a hypothetical case, which Article III to the U.S. Constitution precludes. *Id.* Bozeman argues that the claim is not ripe because there presently is: (1) no one being prosecuted for having a household of more than four persons in a

residential district in which such a household is not permitted; (2) no assisted living facility or elderly care facility that has applied for a conditional use permit that is pending or has been denied; and (3) no community residential facility that has a conditional use permit pending or that has been denied. Thus, Bozeman argues, there is no factual basis on which the Court can consider an affirmative relief request respecting the Ordinance Claim. *Id. at 26-27*.

Bozeman argues that Fair Housing cannot show that: (1) there is a concrete plan to violate the Ordinance; (2) that Bozeman has threatened to prosecute someone for violating the Ordinance; or (3) that Bozeman has a history of prosecuting violations of the Ordinance. *Id. at 27*. Thus, it argues, Fair Housing cannot show facts that justify its request for affirmative relief. *Id. at 27-28*.

## B.  Fair Housing

Fair Housing responds that it has standing to pursue both the Hinesley Claim and the Ordinance Claim. It argues that it has suffered both a diversion of resources and frustration of mission attributable to Bozeman. *Court Doc. 116 at 16-23*.

First, respecting the Hinesley Claim, Fair Housing argues that Bozeman's admitted failures to properly inspect the Hinesley Properties and other properties in Bozeman for compliance with fair housing accessibility guidelines and its failures to properly exercise licensing and regulatory authority to eliminate discrimination caused Fair Housing to suffer the following injuries: (1) diversion of staff time from other activities to investigate Hinesley Property design and construction defects; (2) expenses related to site visits and testing; (3) diversion of resources to counteract harmful effects of decisions to allow non-accessible housing to be constructed and occupied, such as education and outreach concerning design and construction; and (4) continued expenditure of time and resources to review and analyze Bozeman's deficiencies when inspecting and approving dwellings for consistency with fair housing laws. *Id. at 18.*

Fair Housing argues that its injuries caused by Bozeman's acts and omissions are the same as those injuries that the Ninth Circuit has deemed sufficient to establish organizational standing. *Id.* (citing *Smith v. Pacific Prop. and Dev. Corp.*, 358 F.3d 1097, 1105 (9th Cir.

2004)).  Thus, Fair Housing argues, it has standing.

Second, respecting the Ordinance Claim, Fair Housing argues that it has suffered a diversion of resources and frustration of its mission "directly attributable to [Bozeman's] Ordinance."  *Id. at 16.*  It argues that it has produced evidence showing that, before it filed this case, it "diverted resources to investigating and counteracting housing discrimination resulting from Bozeman's zoning/regulatory practices." *Id. at 16-17.*  Fair Housing argues that the injuries it has suffered are analogous to those suffered by the plaintiff in *Combs*, in which the Ninth Circuit found standing.  *Id.* (citing *Combs*, 285 F.3d at 902-05).

Third, Fair Housing argues that the Court should reject Bozeman's attempt to create additional Article III standing requirements.  *Id. at 19-23.*  It argues that there is no requirement that it first advise Bozeman of its concerns about Bozeman's zoning, licensing, or inspection practices before suing in order to establish Article III standing.  *Id. at 19-20.*

Fair Housing also argues that Bozeman's accusation that Fair Housing manufactured litigation is "absurd."  *Id. at 20.*  Rather, Fair

Housing argues, it has produced evidence establishing that it "received a steady stream of complaints about the zoning restrictions over a six-year period, attempted to assist those seeking help, conducted a diligent investigation, provided notice to [Bozeman] of potential fair housing violations, and filed a formal complaint only when it had the time and resources to do so." *Id. at 20-21.* Bozeman never offered to take remedial action, Fair Housing argues, and cannot now "avoid the challenges to the continuation of its unlawful conduct by casting aspersions at [Fair Housing]." *Id. at 21-23.*

Fourth, Fair Housing argues that its claims are ripe for resolution. *Id. at 23-27.* It argues that it "is asking the Court to make a legal determination about whether [Bozeman's] zoning and licensing/inspection practices violate several laws." *Id. at 23-24.* Fair Housing notes that it has "produced significant evidence that it will suffer a hardship if the Court declines to consider these claims[,]" such as having to continue diverting resources to monitoring Bozeman's exclusionary zoning practices, investigating complaints, counseling people on their rights, and educating the public about risks of

discrimination. *Id. at 24.* Because it will continue to suffer injury if its claims are not addressed, Fair Housing argues, its Ordinance Claim is ripe for review. *Id. at 25.*

Also, Fair Housing argues that its Hinesley Claim against Bozeman is ripe. *Id. at 26-27.* It argues that the legal question of whether Bozeman has "discharged its affirmative duties and violated civil rights laws" with respect to the Hinesley Property is ripe and it will continue to suffer injury if the Court declines to consider the claim. *Id.* Also, Fair Housing argues that, contrary to Bozeman's argument, it need not prove that Bozeman will breach its duties or violate fair housing laws in the future to maintain a present claim for past unlawful conduct. *Id. at 27.*

Fifth, Fair Housing argues that its exclusionary zoning claims are not moot. *Id. at 28-29.* It argues that it has presented a live controversy because it continues to receive complaints and inquiries from people about Bozeman's restrictive zoning scheme. *Id. at 28.* The relief it seeks, Fair Housing argues, will redress its injuries and such relief is provided by law. *Id. at 29.*

Fair Housing also argues that its Hinesley Claim is not moot. It argues that it has suffered a diversion of resources and frustration of mission related directly to its claims against Bozeman as those claims stem from the Hinesley Property and that it has presented supporting evidence for the claims. *Id. at 30.* And, Fair Housing argues that the Court should reject Bozeman's argument that Fair Housing is not entitled to declaratory or injunctive relief because such relief is available under both state and federal law. *Id. at 31-32.*

## C.   <u>Bozeman's Reply</u>

In reply, Bozeman first argues that Fair Housing does not have standing to pursue its Ordinance Claim because it has produced no evidence that it has devoted resources in connection with either: (1) Section 18.16.020's treatment of "assisted living/elderly care facilities[,]" *Bozeman's Reply (Court Doc. 122) at 5-6*; or (2) Section 18.80.1390(D)'s definition of "household" that relates to its facial challenge to Bozeman's ordinances. *Id. at 6-7.*

Second, Bozeman argues that Fair Housing does not have standing to pursue the Hinesley Claim because Fair Housing's injuries

are attributable to its own failure to act when it became aware of accessibility violations in October 2008. Fair Housing failed to advise Bozeman of the deficiencies to prevent Bozeman from issuing certificates of occupancy. *Id. at 8.*

Third, Bozeman argues that it is not attempting to create additional Article III standing elements. Respecting the Hinesley Claim, Bozeman argues, Fair Housing cannot show that its injuries are fairly traceable to Bozeman's actions, but rather are the result of Fair Housing's own action of not asking Bozeman to address the Hinesley Property violations. *Id. at 9.* Respecting the Ordinance Claim, Bozeman argues that Fair Housing's failure to do anything for five years while the ordinance was in place demonstrates that it manufactured any injury it now claims. Thus, Bozeman argues, Fair Housing cannot show that its injuries are fairly traceable to any action by Bozeman. *Id. at 9-11.*

Fourth, Bozeman argues that Fair Housing's Ordinance Claim is not ripe. It argues that Fair Housing waited five years to bring this action and, when it finally did so, it did not bring the action on behalf of

"assisted living/elderly care facilities, community residential facilities, the disabled, the elderly, and unmarried couples." *Id. at 12.* Rather, Bozeman argues, Fair Housing brought the action on behalf of "landlords, property managers, and realtors frustrated with the [Unified Development Ordinance's] prohibition against housekeeping units with more than four unrelated people." *Id.* Also, Bozeman argues, Fair Housing's claim that Bozeman failed to enforce the FHAA with respect to the Hinesley Properties fails because the FHAA does not impose a duty on Bozeman to inspect properties for compliance with the FHAA. *Id. at 13-15.*

Fifth, Bozeman argues that Fair Housing's claims relating to the Hinesley Properties are moot. It argues that Fair Housing claims past damages of $27,897.49, which is less than the $28,000 award for past damages provided in the Hinesley Consent Decree. Fair Housing's estimate of future damages is "pure speculation[,]" Bozeman argues, and in any event, that figure barely exceeds the Consent Decree's award for future damages. Thus, Bozeman argues, Fair Housing has been paid for all damages it has incurred whether they are traceable to

Bozeman or to the Hinesleys and the Hinesley Claim against Bozeman is moot. *Id. at 15-16.*

## IV. __DISCUSSION__

Standing is a component of Article III's limitation on federal jurisdiction permitting adjudication only of actual "cases" and "controversies." *Allen v. Wright*, 468 U.S. 737, 750 (1984). The Ninth Circuit recently reaffirmed in *Lake Forest*, *supra*, that the "'irreducible constitutional minimum of standing' consists of these three elements: (1) injury in fact; (2) causation; and (3) redressability." 624 F.3d at 1088 (quoting *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992)). The injury must be "an invasion of a legally protected interest which is (a) concrete and particularized, and (b) actual or imminent, not conjectural or hypothetical[.]" *Lujan*, 504 U.S. at 560. Respecting causation, "there must be a causal connection between the injury and the conduct complained of – the injury has to be fairly trace[able] to the challenged action of the defendant, and not ... the result [of] independent action of some third party not before the court." *Id*. And, "it must be 'likely,' as opposed to merely 'speculative,' that the injury will be 'redressed by a

favorable decision.'" *Id.* at 561 (citation omitted) (alterations in original). The party invoking federal jurisdiction bears the burden of establishing standing. *Id.*

*Lujan* established the test for determining whether an individual plaintiff has standing. The same test applies in determining whether an organizational plaintiff has standing. *Id.* (citing *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 378 (1982) ("In determining whether [organizational plaintiff Housing Opportunities Made Equal (HOME)] has standing under the Fair Housing Act, we conduct the same inquiry as in the case of an individual.")).

In *Lake Forest*, the Ninth Circuit described the organizational standing test as follows:

> An organization suing on its own behalf can establish an injury when it suffered "both a diversion of its resources and a frustration of its mission." *Combs*, 285 F.3d at 905. It cannot manufacture the injury by incurring litigation costs or simply choosing to spend money fixing a problem that otherwise would not affect the organization at all. *See, e.g., Fair Employment Council v. BMC Mktg. Corp.*, 28 F.3d 1268, 1276-77 (D.C. Cir. 1994). It must instead show that it would have suffered some other injury if it had not diverted resources to counteracting the problem. In *Havens*, for example, housing discrimination threatened to make it more difficult for HOME to counsel people on where they might

live if the organization didn't spend money fighting it. 455 U.S. at 379. The organization could not avoid suffering one injury or the other, and therefore had standing to sue. *Cf. Smith v. Pacific Props. & Dev. Corp.*, 358 F.3d 1097, 1105 (9th Cir. 2004) (organization "had ... to divert its scarce resources from other efforts"); *El Rescate Legal Servs., Inc. v. Exec. Office of Immigration Rev.*, 959 F.2d 742, 748 (9th Cir. 1992) (challenged policy "require[d] the organizations to expend resources ... they otherwise would spend in other ways").

624 F.3d at 1088.

"[A] plaintiff must demonstrate standing separately for each form of relief sought." *Friends of the Earth, Inc. v. Laidlaw Environmental Services (TOC), Inc.*, 528 U.S. 167, 185 (2000) (citing *City of Los Angeles v. Lyons*, 461 U.S. 95, 109 (1983) (notwithstanding the fact that plaintiff had standing to pursue damages, he lacked standing to pursue injunctive relief) and *Lewis v. Casey*, 518 U.S. 343, 358, n.6 (1996) ("[S]tanding is not dispensed in gross.")). And, "a plaintiff must demonstrate standing for each claim he seeks to press." *DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 352 (2006) (citation omitted).

The Court begins its analysis here by applying the above-referenced organizational standing test and general standing principles

to Fair Housing's claims as Bozeman has designated them – the Hinesley Claim and the Ordinance Claim – and to the types of relief Fair Housing seeks for each claim.

### A. Fair Housing's Request for Damages Stemming from Both the "Hinesley Claim" and the "Ordinance Claim"

The Court concludes that Fair Housing has standing to seek damages against Bozeman on both the Hinesley Claim and the Ordinance Claim. Fair Housing has presented evidence sufficient to demonstrate that it has suffered injuries in fact caused by Bozeman's alleged acts and omissions that would be redressed by awarded damages. *Lujan*, 504 U.S. at 560. Summary judgment based on lack of standing, therefore, should be denied.

Fair Housing has presented evidence that:

(1) its mission since it began operations in 1988 has been "the promotion of equal housing opportunities and elimination of discriminatory housing practices – including exclusionary zoning practices and failures to meet fair housing accessib[ility] requirements" *Bean Decl. (Court Doc. 117-1), ¶ 7*; and

(2) Bozeman's alleged acts and omissions at issue in this action

33

have caused Fair Housing to suffer both a diversion of its resources and a frustration of its stated mission, including:

(a) diversion of staff time from other functions to investigate the Hinesley Property's and other properties' design and construction defects, *Court Doc. 117-1, ¶¶ 4,5, and 8*;

(b) expenses incurred in performing site visits and testing, *id., ¶ 16; Bean Depo. (Court Doc. 98-6) at 57, l. 15 – 59, l. 19*;

(c) expenses incurred in performing tasks intended to counteract Bozeman's allegedly unlawful housing practices, including distributing educational and outreach materials containing design and construction information, creating and providing a listing of accessible housing in November 2009, and including – in an April 2010 fair housing conference – design and construction information that took about one quarter of the conference at the expense of other topics, *Court Doc. 117-1, ¶ 15; Court Doc. 98-6, 57, l. 15 – 59, l. 19, 92, l. 8 – 93, l. 8*;

(d) expenditure of time and resources and diversion of resources to try to counteract loss of equal housing resulting from

Bozeman's alleged exclusionary zoning or discriminatory land use practices and use of resources to "actively pursue changes to those practices since at least 2008[,]" Court Doc. 117-1, ¶ 8; and

(e) expenditure of time and resources reviewing and analyzing alleged ongoing deficiencies in Bozeman's practices respecting inspecting and approving covered dwellings consistent with applicable laws and regulations, *Court Doc. 117-1, ¶¶ 12-14*.

Fair Housing has presented evidence of "distinct and palpable injuries" that are "fairly traceable" to Bozeman's alleged acts and omissions. *Havens*, 455 U.S. at 376; *see also Lake Forest*, 624 F.3d at 1088 (citing *Pacific Props.*, 358 F.3d at 1105 and *El Rescate Legal Servs., Inc.*, 959 F.2d at 748). The Supreme Court made clear in *Havens* that "[s]uch concrete and demonstrable injury to the organization's activities – with the consequent drain on the organization's resources – constitutes far more than simply a setback to the organization's abstract social interests." 455 U.S. at 379. Also, had Fair Housing not diverted resources to counteract Bozeman's alleged acts and omissions respecting the Hinesley Properties and other

properties, Fair Housing's mission of promoting equal housing opportunities and eliminating discriminatory housing practices would have been more vulnerable to failure. Thus, Fair Housing has demonstrated its standing to pursue damages on both the Hinesley Claim and the Ordinance Claim.

The Court reached this conclusion mindful of Bozeman's argument that Fair Housing created its own damages by pursuing a course of litigation rather than first alerting Bozeman both to deficiencies with the Hinesley Property and to city ordinances out of compliance with fair housing laws. As discussed, Fair Housing has presented evidence that it has suffered injury in fact caused by Bozeman's alleged acts and omissions. That is all that is required.

Bozeman has cited no authority – and the Court is aware of none – that requires Fair Housing to first consult with the party against whom it is claiming damages before initiating a lawsuit. Rather, at least one federal appellate court has held expressly that there is no such requirement. *See Tyus v. Urban Search Management*, 102 F.3d 256, 264-65 (7th Cir. 1996) (in Fair Housing Act case challenging

advertising for "upscale apartment house" as racially discriminatory, court noted FHA "does not require notification prior to filing a suit, nor does it require a suit to be filed upon viewing or hearing the first discriminatory ad.").

Also, provided the plaintiff has satisfied the "irreducible constitutional minimum for standing[,]" as Fair Housing has here, there is no additional requirement that a plaintiff demonstrate a particular motive before initiating litigation. Bozeman's allegation that Fair Housing was motivated by money to pursue this action, even if true, is irrelevant and therefore unpersuasive.

Next, the Court concludes that Fair Housing's claims for damages are ripe and are not moot. Two factors determine whether a claim is ripe: (1) "the fitness of the issues for judicial decision[,]" and (2) "the hardship to the parties of withholding court consideration." *San Luis & Delta-Mendota Water Authority v. Salazar*, 638 F.3d 1163, 1173 (9th Cir. 2011) (quoting *Abbot Laboratories v. Gardner*, 387 U.S. 136 (1967), *overruled on other grounds*, *Califano v. Sanders*, 430 U.S. 99 (1977) and citing, in accord, *National Park Hospitality Ass'n v. Department of*

*Interior*, 538 U.S. 803, 812 (2003); *W. Watersheds Project v.*

*Kraayenbrink*, 632 F.3d 472, 486 (9th Cir. 2011)).

Here, Fair Housing's claims for damages are ripe under the above

authority.  First, Fair Housing's claims for damages are fit for judicial

review.  As evidenced by the foregoing discussion, the parties have

engaged in significant factual development of the record.  Their

disputes are ready for disposition.  Second, in light of Fair Housing's

alleged injuries discussed above, it is reasonable to conclude that Fair

Housing may suffer a hardship in fulfilling its stated mission were the

Court to withhold consideration of its claims.  Thus, the claims are ripe.

Also, the Court concludes that genuine issues of material fact

exist that preclude summary judgment in Bozeman's favor respecting

its argument that Fair Housing's Hinesley Claim is moot.[2]  As noted,

Bozeman argues that the Hinesley Claim is moot because damages

awarded to Fair Housing when it resolved its claims against the

Hinesleys are sufficient to pay all of Fair Housing's damages.  *Court*

*Doc. 104 at 19-20; Court Doc. 122 at 15-16.*

---

[2]Bozeman notes in its Reply Brief that it has not argued that the
Ordinance Claim is moot.  *Court Doc. 122 at 15.*

38

"To qualify for adjudication in a federal court, a live controversy must exist at all stages of the litigation, not simply at the time plaintiff filed the complaint." *Vasquez v. Los Angeles ("LA") County*, 487 F.3d 1246, 1253 (9th Cir. 2007) (citations omitted). The Supreme Court has defined the mootness doctrine as the "doctrine of standing set in a time frame: The requisite personal interest that must exist at the commencement of the litigation (standing) must continue throughout its existence (mootness)." *Id.* at n.6 (quoting *United States Parole Comm'n v. Geraghty*, 445 U.S. 388, 397 (1980)). In short, "any change in the facts that ends the controversy renders the case moot." *Id.* (citing Erwin Chemerinsky, FEDERAL JURISDICTION 125-26 (4th ed. 2003) (internal citations omitted)).

Here, fact issues respecting the amount of damages Fair Housing has incurred and may incur in the future preclude summary judgment based on mootness. As noted, Fair Housing has presented evidence of alleged injuries in the form of diversion of its resources and frustration of its mission stemming, at least in part, from Bozeman's alleged conduct related to the Hinesley Claim. For example, as Bozeman notes,

Fair Housing estimates that it will incur $31,500 to address future issues and the Consent Decree provided an award of $30,000 for future damages. *Court Doc. 122 at 16.* The discrepancy between these amounts, among others, precludes summary judgment based on mootness.

For all of the foregoing reasons, the Court will recommend that Bozeman's motion be denied to the extent it seeks summary judgment on Fair Housing's claims for damages.

### B. <u>Fair Housing's Request for Declaratory and Injunctive Relief Stemming from Both the "Hinesley Claim" and the "Ordinance Claim"</u>

Next, the Court considers whether Fair Housing has standing to seek declaratory and injunctive relief on its claims. For these types of relief, Fair Housing cannot rely only on past injury. It must not only satisfy the three-part test discussed above, including showing that its injury is "actual or imminent, not conjectural or hypothetical," *Lujan*, 504 U.S. at 560, it also must demonstrate a "very significant possibility of future harm" to warrant the relief requested. *San Diego County Gun Rights Comm'n v. Reno*, 98 F.3d 1121, 1126 (9th Cir. 1996). And "a

plaintiff who has standing to seek damages for a past injury, or injunctive relief for an ongoing injury, does not necessarily have standing to seek prospective relief such as a declaratory judgment." *Mayfield v. U.S.*, 599 F.3d 964, 969 (9th Cir. 2010) (citations omitted). While "a plaintiff must show [among other things] that he faces imminent injury on account of the defendant's conduct[,] ... [p]ast exposure to harmful or illegal conduct does not necessarily confer standing to seek injunctive relief if the plaintiff does not continue to suffer adverse effects. Nor does speculation or 'subjective apprehension' about future harm support standing. Once a plaintiff has been wronged, he is entitled to injunctive relief only if he can show that he faces a 'real or immediate threat ... that he will again be wronged in a similar way.'" *Id.* at 970 (citations omitted).

Without deciding the merits of Fair Housing's claims, the Court concludes that Fair Housing has presented enough evidence to satisfy the additional standing requirement for its requests for declaratory and injunctive relief. Fair Housing has presented evidence that there exists "a very significant possibility of future harm" and that it will suffer real

or immediate injury if its claims are not considered.

First, Fair Housing has presented evidence, described above, that it has diverted and will continue to divert resources: (1) monitoring Bozeman's zoning practices; (2) investigating complaints; (3) counseling people on their fair housing rights; and (4) educating the public respecting potentially discriminatory practices and risk of prosecution for violating ordinances. *See Fair Housing's Stmt. of Genuine Issues (Court Doc. 117), ¶ 22(a) - (e)* (citing exhibits).

Second, Fair Housing has presented evidence of Bozeman's past conduct enforcing its municipal housing ordinances. The evidence shows that Bozeman sent several notices between 2005 and 2009 advising people that they were in violation of Bozeman's municipal code for housing. Some notices also advised recipients that they could face monetary penalties and possible incarceration if cited for the violations. *Court Doc. 100-3 at 1-9; Court Doc. 100-4 at 1-6.* Fair Housing maintains that continued enforcement of Bozeman's zoning scheme imposes upon it a real and immediate injury by restricting equal housing opportunities in Bozeman and undermining Fair Housing's

mission. Based on the evidence presented, it is reasonable to believe that Bozeman will continue its enforcement practices. *See Steel Co. v. Citizens for a Better Environment*, 523 U.S. 83, 108-09 (1998) (evidence that defendants repeatedly engaged in injurious acts in past may show sufficient likelihood that defendants will engage in them in near future for purposes of standing to sue). Bozeman's disagreement with Fair Housing on this issue creates, at a minimum, a fact issue.

Third, Fair Housing has presented evidence supporting its allegation that Bozeman continues to use inspection and approval practices that do not comply with its obligation to eliminate discrimination in exercising its licensing and regulatory powers. *Court Doc. 117-1 (Bean Decl.), ¶ 3* (noting that Fair Housing has identified two other newly constructed multi-family buildings not in compliance with accessibility standards but nevertheless certified for occupancy in March 2010).

For the foregoing reasons, the Court will recommend that Bozeman's motion be denied to the extent it seeks summary judgment on Fair Housing's claims for affirmative relief.

## V.    <u>CONCLUSION</u>

Based on the foregoing, IT IS RECOMMENDED that Bozeman's summary judgment motion (*Court Doc. 101*) be DENIED.

NOW, THEREFORE, IT IS ORDERED that the Clerk shall serve a copy of the Findings and Recommendation of United States Magistrate Judge upon the parties. The parties are advised that pursuant to 28 U.S.C. § 636, any objections to the findings and recommendation must be filed with the Clerk of Court and copies served on opposing counsel within fourteen (14) days after service hereof, or objection is waived.

DATED this 7th day of December, 2011.


/S/ Carolyn S. Ostby
United States Magistrate Judge