IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MONTANA

BUTTE DIVISION

| | | |
|---|---|---|
| MONTANA FAIR HOUSING, INC., | ) | CV 09-90-BU-DLC |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | ORDER |
| | ) | |
| CITY OF BOZEMAN, ANDY EPPLE, | ) | |
| VICKI HASLER, and the HINESLEY | ) | |
| FAMILY LIMITED PARTNERSHIP #1, | ) | |
| HINESLEY DEVELOPMENT and | ) | |
| CHARLES W. HINESLEY, | ) | |
| | ) | |
| Defendants. | ) | |
| _____ | ) | |

## I. Introduction

Plaintiff Montana Fair Housing, Inc., ("Fair Housing") brings this action against Defendants City of Bozeman, Andy Epple, and Vicki Hasler (collectively, "Bozeman"), asserting federal and state claims for exclusionary zoning practices and discrimination in property inspection and licensing. Fair Housing alleges

Bozeman's municipal zoning ordinance discriminates based on disability, age, and marital status.  Fair Housing also claims Bozeman has violated Montana law by failing to take affirmative steps to ensure that its zoning and building code enforcement practices are non-discriminatory and compliant with the law.[1]

Fair Housing has filed a motion for partial summary judgment on Counts III, IV, V, VII, and VIII of its Complaint.  For the reasons that follow, the motion is granted in part and denied in part with respect to Counts III, IV, V, and VII, and denied with respect to Count VIII.

## II.  Factual Background

### A.  Bozeman's Zoning Ordinance

The City of Bozeman is a municipality and political subdivision of the state of Montana as defined in Mont. Code Ann. § 7-1-4121(9) and (15), and a local governmental agency as defined by Mont. Code Ann. § 49-3-101(a), and as such its conduct is governed by federal and state fair housing laws.  The City of Bozeman carries out a number of governmental functions related to the regulation of land use and development, including enactment and enforcement of zoning

---

[1]The Complaint also states claims against Defendants Hinesley Family Limited Partnership #1, Hinesley Development and Charles W. Hinesley (collectively, "the Hinesleys"). The claims against the Hinesleys have been resolved by a Consent Order and Judgment against the Hinesleys and in favor of Fair Housing, and are not implicated by the instant motion.

regulations, subdivision review and approval, building code inspection and enforcement, and issuance of building permits and certificates of occupancy.

Effective January 1, 2004, Bozeman adopted a Unified Development Ordinance (the "Ordinance") to replace what had until that point been a patchwork of regulations governing zoning and development.  At issue for purposes of this motion are § 18.16.020 of the Ordinance, which addresses authorized uses within each zoning district (the "Authorized Uses Section") and § 18.80.1390 of the Ordinance, which defines the term "household" for purposes of the Ordinance (the "Household Definition Section").

The Authorized Uses Section, which is set forth in greater detail in the Analysis section of this Order, contains a table listing each type of residential use and indicating whether and to what extent each use is permitted in each of the city's zoning districts.  Noteworthy for purposes of Fair Housing's claims is the treatment of "Assisted Living/Elderly Care Facilities," which are permitted in one zoning district, allowed on a conditional basis in two districts, and not permitted in four districts.  Ordinance § 18.16.020.  The areas in which "Assisted Living/Elderly Care Facilities" are not permitted include districts R-S, R-1, and R-2, which are among the more desirable residential areas of the city.

A "single-household dwelling" is a permitted use in every zoning district in

Bozeman.  Under the Household Definition Section of the Ordinance, the term

"household" means, *inter alia*, a single common housekeeping unit comprised of

"[a]ny number of people related by blood, marriage, adoption, guardianship or

other duly-authorized custodial relationship."  Ordinance § 18.80.1390(A).  The

definition of "household" explicitly excludes common housekeeping units

comprised of more than four unrelated people or more than four handicapped

people.  Ordinance § 18.80.1390(B), (D)(2).

## B.    Fair Housing's Claims

Counts III, IV and V of the Complaint allege that the Authorized Uses

Section and the Household Definition Section discriminate against individuals

with disabilities[2] in violation of the federal Fair Housing Act[3], 42 U.S.C. §§ 3601,

et seq. (Count III), the Americans with Disabilities Act, 42 U.S.C. §§ 12101, et

seq. (Count IV), and Section 504 of the Rehabilitation Act, 29 U.S.C. § 794

---

[2]The Court will sometimes uses the term and variations of the term "handicap" rather than the term and variations of the term "disability" to remain consistent with the language of the controlling statutes and the Ordinance.  For purposes of this Order, the Court considers the terms to be interchangeable.

[3]The Fair Housing Act was amended in 1988 and courts subsequently have referred to it as the "Fair Housing Act Amendments," Gamble v. City of Escondido, 104 F.3d 300, 304 (9th Cir. 1997), and the "Fair Housing Amendments Act."  Nevada Fair Housing Center, Inc. v. Clark County, 565 F.Supp.2d 1178, 1181 (D. Nev. 2008); see also 42 U.S.C.A. § 3601, Historical and Statutory Notes for 1988 Amendments providing that "[t]his Act ... may be cited as the 'Fair Housing Amendments Act of 1988.'"  For brevity and consistency with Fair Housing's claims, the Court will refer to the relevant statute as the Fair Housing Act.

(Count V).  Count III further alleges that Bozeman has violated the Fair Housing

Act by publishing material indicating a discriminatory preference against the

disabled with respect to housing opportunities and by unlawfully steering

individuals with disabilities away from certain housing opportunities.

In Count VII of the Complaint, Fair Housing alleges that the Ordinance violates

the Montana Human Rights Act, Mont. Code Ann. §§ 49-2-302, 49-2-305, by

discriminating against individuals with disabilities (both the Authorized Uses and

Household Definition Sections), the elderly (Authorized Uses Section only), and

unmarried people (Household Definition Section only).  Count VIII alleges that

Bozeman has violated the Montana Governmental Code of Fair Practices, Mont.

Code Ann. §§ 49-3-204 and 49-3-205, by failing to take affirmative steps to

ensure equal treatment of all persons in the exercise of its licensing and regulatory

powers and to analyze its operations to identify any possible instances of

discriminatory conduct.  Fair Housing seeks summary judgment on each of these

claims.

### III.  Analysis

### A.    Summary Judgment Standard

A party is entitled to summary judgment if it can demonstrate "that there is

no genuine dispute as to any material fact and the movant is entitled to a judgment

as a matter of law." Fed. R. Civ. P. 56(a).  Summary judgment is warranted where the documentary evidence produced by the parties permits only one conclusion. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 251 (1986).  On a motion for summary judgment, this Court must determine whether a fair-minded trier of fact could return a verdict for the nonmoving party.  Id. at 252.

The party seeking summary judgment bears the initial burden of informing the Court of the basis for its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of any genuine issue of material fact.  Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).

Where the moving party has met his initial burden with a properly supported motion, the party opposing the motion "may not rest upon the mere allegations or denials of his pleading, but . . . must set forth specific facts showing that there is a genuine issue for trial."  Anderson, at 248.  The nonmoving party may do this by use of affidavits (including his own), depositions, answers to interrogatories, and admissions.  Id.

In evaluating the appropriateness of summary judgment the Court must first determine whether a fact is material; and if so, it must then determine whether there is a genuine issue for the trier of fact, as determined by the documents

submitted to the Court.  The applicable substantive law will identify which facts
are material.  Only disputes over facts that might affect the outcome of the suit
under the governing law will properly preclude entry of summary judgment.
Factual disputes which are irrelevant or unnecessary to the outcome are not
considered.  Anderson, at 248.

**B.     Discussion**

### 1.     Does the Ordinance Violate Federal Anti-Discrimination Statutes Protecting the Handicapped? (Counts III, IV, and V)

Fair Housing argues that both the Authorized Uses Section and the
Household Definition Section of the Ordinance violate the Fair Housing Act, the
Americans with Disabilities Act, and Rehabilitation Act (collectively "the federal
acts") because the sections are facially discriminatory against the handicapped.[4]
The parties agree that the federal acts impose substantively similar prohibitions
against housing discrimination, exemplified by the Fair Housing Act's provision
making it unlawful "[t]o discriminate in the sale or rental, or to otherwise make

---

[4]Fair Housing argues in its Reply Brief that with respect to discrimination against the
disabled, it challenges the Ordinance both facially and as applied.  Doc. No. 123 at 2.  Fair
Housing makes no mention of an as-applied challenge in its Opening Brief on summary
judgment, and casts both its state and federal claims on summary judgment as facial challenges.
Doc. No. 107 at 23-33.  Because the as-applied challenge argument was raised for the first time
in Fair Housing's reply brief, the Court need not consider it.  See Zamani v. Carnes, 491 F.3d
990, 997 (9th Cir. 2007).  Moreover, Fair Housing fails to identify any facts in the record to
support summary judgment in its favor based on an as-applied challenge.  Accordingly, the Court
will consider only the facial challenges articulated in Fair Housing's opening brief.

unavailable or deny, a dwelling to any buyer or renter because of a handicap ...."

42 U.S.C. § 3604(f); see also City of Edmonds v. Oxford House, Inc., 514 U.S.

725, 728 (1995).  The Ninth Circuit has held that the federal acts apply to a city's

zoning ordinances such as those at issue in this case.  City of Edmonds v.

Washington State Building Code Council, 18 F.3d 802, 805 (9th Cir.1994); Bay

Area Addiction Research and Treatment, Inc. v. City of Antioch, 179 F.3d 725,

730-31 (9th Cir. 1999).  Thus, the Court considers together Fair Housing's claims

that the Ordinance discriminates against the handicapped in violation of the

federal acts.

        "A facially discriminatory policy is one which on its face applies less

favorably to a protected group."  Community House, Inc. v. City of Boise, 490

F.3d 1041, 1048 (9th Cir. 2007).  Once a plaintiff makes out a prima facie case of

facial discrimination, the defendant may attempt to demonstrate that the

challenged law's less-favorable application to the protected class is nonetheless

permitted under the federal acts because the discrimination is objectively

legitimate.  Under the Fair Housing Act, a defendant seeking to justify a facially

discriminatory policy must show "either: (1) that the restriction benefits the

protected class or (2) that it responds to a legitimate safety concern raised by the

individuals affected, rather than being based on stereotypes."  Community House,

490 F.3d at 1050.  The Americans with Disabilities Act and the Rehabilitation Act require a showing that the class of people subject to the discriminatory policy "w[ere] likely to pose a significant threat to the health or safety of the residents protected by the zoning ordinance."  Bay Area Addiction, 179 F.3d at 736.

### a.    The Authorized Uses Section

The Authorized Uses Section of the Ordinance provides in relevant part:

> Uses in the various residential districts are depicted in the table below. Principal uses are indicated with a "P", conditional uses are indicated with a "C", accessory uses are indicated with an "A" and uses which are not permitted within the district are indicated by a "–."

| Table of Residential Uses | R-S | R-1 | R-2 | R-3 | R-4 | R-0 | RMH |
|---|---|---|---|---|---|---|---|
| Assisted Living/Elderly Care Facilities | – | – | – | C | C | P | – |
| Community residential facilities (more than 4 residents) | C | C | C | P | P | P | C |
| Cooperative Housing | C | C | C | P | P | P | C |
| Fraternity & Sorority Houses | – | – | – | C | P | P | – |
| Single-household dwelling | P | P | P | P | P | P | P |
| Two-household dwelling | – | – | P | P | P | P | – |
| Three or four household dwelling | – | – | – | P | P | P | – |

Ordinance § 18.16.020.

### i.    Is the Authorized Uses Section Facially Discriminatory Against the Handicapped?

The Authorized Uses Section discriminates against the handicapped on its face. The parties stipulate that an assisted living facility provides housing opportunities for persons with disabilities and the elderly. Doc. No. 32 at ¶ 2(q) (citing MCA § 50-5-101(7)). According to the first line of the table excerpted above, such facilities are not permitted under the Authorized Uses Section in zoning districts R-S, R-1, R-2, and RMH. In contrast, single-household dwellings are permitted as principal uses in every district in the city, and community residential facilities and cooperative housing are permitted or conditional uses in all districts. On its face, then, the Authorized Uses Section applies less favorably to a protected group, i.e., individuals who require assisted living care due to disabilities. Community House, 490 F.3d at 1048.

Bozeman argues that the Authorized Uses Section is not facially discriminatory because despite the clear statement prohibiting assisted living and elderly care facilities in certain districts, the Ordinance as a whole can be read to allow such facilities in every residential district in the city. Bozeman begins by invoking § 18.02.050 of the Ordinance, which requires that "subsections of the Ordinance shall be construed in a manner that will give effect to them all as the Ordinance derives its meaning from the entire body of text taken together." From there, Bozeman notes that "Community residential facilities" are permitted or

conditional uses in each district, and that the definition of a "Community residential facility" includes among its six categories "[a]ny facility defined in § 76-2-411, MCA."  That statute includes "any assisted living facility licensed under [Mont. Code Ann. §] 50-5-227" within the meaning of "Community residential facility."  Mont. Code Ann. § 76-2-411(5).  Bozeman then proceeds to the Household Definition Section of the Ordinance, which states that a "Community residential facility" with four or fewer residents falls within the meaning of the term "household."  Ordinance 18.80.1390(D)(1).  Thus, Bozeman concludes that assisted living and elderly care facilities are allowed everywhere that "Community residential facilities" are allowed, and the Authorized Uses Section is not discriminatory.

The Court is not persuaded by Bozeman's argument.  To accept Bozeman's position, a person reading the Authorized Uses Section would have to ignore the table's express language declaring that such facilities are categorically not permitted in districts R-S, R-1, R-2, and RMH, and therefore bypass the stark expression of exclusionary policy set out in the Authorized Uses table in favor of a convoluted interpretation of various Ordinance provisions and incorporated Montana statutes.   This is a task beyond the capacity of the ordinary reader who would look at this table and logically conclude that assisted living and elderly care

facilities are simply not allowed in certain districts.

Thus, while Bozeman's preferred reading of the Ordinance might be an arguable legal interpretation, it does not refute the charge that the Authorized Uses Section is facially discriminatory in light of the fact that: (1) "Community residential facilities" and "Assisted living/elderly care facilities" are explicitly listed separately in the Authorized Uses table;[5] and (2) in the table, assisted living and elderly care facilities are expressly not permitted in districts R-S, R-1, R-2, and RMH while community residential facilities are allowed in those districts as conditional uses, thus indicating the facilities are different. In sum, Bozeman offers a strained interpretation of the Authorized Uses Section that is inconsistent with its plain language.

Having determined that the Authorized Uses Section is facially discriminatory, the Court next must determine whether the differential treatment of people with disabilities under the Ordinance is nonetheless permitted under the federal acts. Here Bozeman must show either that the discriminatory provision

---

[5]The Court notes that, while attempting to argue that assisted living facilities and elderly care facilities are one and the same for purposes of the Ordinance, Bozeman states, "If assisted living facilities and elderly care facilities were not considered the same, they would appear as separate facilities in separate boxes in [the Authorized Uses table]." Response brief (Doc. No. 114) at 11. Under this logic, the fact that "Assisted living/elderly care facilities" occupy a separate box in the Authorized Uses table from that of "Community residential facilities" undermines Bozeman's argument that "Assisted living/elderly care facilities" are the same as "Community residential facilities."

benefits the disabled or that the Ordinance discriminates based on a legitimate

safety concern.  Community House, 490 F.3d at 1050; Bay Area Addiction, 179

F.3d at 736.

Bozeman justifies the limitations in the Authorized Uses Section as

necessary "to preserve the residential character of each of the residential districts

and to provide that the uses in each district are compatible."  Doc. No. 114 at 21.

In offering only these justifications Bozeman relies on Gamble v. City of

Escondido, 104 F.3d 300 (9th Cir. 1997), and Budnick v. Town of Carefree, 518

F.3d 1109 (9th Cir. 2008), both of which apply the McDonnell Douglas/Burdine[6]

test.  Bozeman's reliance on Gamble and Budnick is misapplied in this instance

because neither case involved a facially discriminatory housing ordinance; rather,

both cases stemmed from denials of conditional use permits.  Gamble, 104 F.3d at

305; Budnick, 518 F.3d at 1114.  The Ninth Circuit in Community House

explicitly rejected application of the McDonnell Douglas/Burdine test in Fair

Housing Act challenges where the plaintiff has demonstrated facial discrimination.

--------

[6]See McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973); Texas Dep't of
Community Affairs v. Burdine, 450 U.S. 248 (1981).  The McDonnell Douglas/Burdine test first
places the burden of proof on the plaintiff to establish a prima facie case of discrimination.  Once
this occurs, the burden shifts to the defendant, who must articulate a legitimate,
nondiscriminatory reason for its action.  The burden then returns to the plaintiff to prove by a
preponderance of the evidence that the defendant's asserted reason is a mere pretext.  Gamble,
104 F.3d at 305 (citations omitted); Budnick, 518 F.3d at 1114 (citations omitted).

490 F.3d at 1049.

Applying the proper test, Bozeman has failed to show that its discriminatory policy is objectively legitimate because the preservation of a neighborhood's residential character neither benefits the disabled nor responds to a legitimate, non-stereotypical safety concern.  See H.R. Rep. No. 100-711, 100th Cong., 2d Sess. 13, reprinted in 1988 U.S. Code Cong. & Admin. News 2179 ("Generalized perceptions about disabilities and unfounded speculations about threats to safety are specifically rejected as grounds to justify exclusion.").  Because Bozeman has failed to demonstrate an objectively legitimate basis for discrimination as required under the federal acts, Fair Housing is entitled to summary judgment on its claim that the Authorized Uses Section violates the federal acts by discriminating against the disabled.

   **ii.**  **Does the Authorized Uses Section Constitute a Discriminatory Statement Under the Fair Housing Act?**

The Fair Housing Act makes it unlawful to print any document "that indicates a preference, limitation, or discrimination based on ... handicap ... or an intention to make any such preference, limitation, or discrimination."  42 U.S.C. § 3604(c).  Fair Housing argues that the Authorized Uses Section violates this provision because it is facially discriminatory.  Bozeman argues that the

Authorized Uses Section does not violate § 3604(c), relying on its argument, which is rejected in the preceding section of this analysis, that the Authorized Uses Section is not facially discriminatory.

Because the Court has determined that the Authorized Uses Section is facially discriminatory, it necessarily follows that the section violates 42 U.S.C. § 3604(c).  Thus, Bozeman's argument fails and Fair Housing is entitled to summary judgment on this claim.

### iii.    Does the Authorized Uses Section Constitute Unlawful Steering Under the Fair Housing Act?

Department of Housing and Urban Development regulations that interpret the Fair Housing Act extend the statute's prohibition on housing discrimination to cover acts of unlawful "steering."  24 C.F.R. § 100.70 provides, in relevant part, that:

> (a)    It shall be unlawful, because of ... handicap ... to restrict or attempt to restrict the choices of a person by word or conduct in connection with seeking, negotiating for, buying or renting a dwelling so as to perpetuate, or tend to perpetuate, segregated housing patterns, or to discourage or obstruct choices in a community, neighborhood or development.

> *      *      *

> (c)    Prohibited actions under paragraph (a) of this section, which are generally referred to as unlawful steering practices, include, but are not limited to:

(1)     Discouraging any person from inspecting, purchasing or
renting a dwelling because of ... handicap ... or because of the
... handicap ... of persons in a community, neighborhood or
development.

\*          \*          \*

(d)     Prohibited activities relating to dwellings under paragraph (b) of this
section include, but are not limited to:

\*          \*          \*

(2)     Employing codes or other devices to segregate or reject
applicants, purchasers or renters, refusing to take or to show
listings of dwellings in certain areas because of ... handicap ...
or refusing to deal with certain brokers or agents because they
or one or more of their clients are of a particular ... handicap[.]

Fair Housing contends the Authorized Uses Ordinance constitutes unlawful

steering under these regulations.

Bozeman advances two principal arguments challenging Fair Housing's

unlawful steering claim.  First, Bozeman argues that as a municipality, it has a

constitutional "right to zone."  Doc. No. 114 at 4.  To support this proposition

Bozeman relies on Village of Euclid v. Amber Realty Co., 272 U.S. 365 (1926),

and Village of Belle Terre v. Borass, 416 U.S. 1 (1974).  Contrary to Bozeman's

view, these cases do not confirm the presence of a constitutional right to enact

zoning laws which can be used to defy statutory restrictions on the exercise of the

police power to create zoning districts.  Rather, they hold that a municipality's

-16-

exercise of zoning power does not inherently violate the due process or equal

protection clauses of the Fourteenth Amendment.  Euclid, 272 U.S. at 397; Belle

Terre, 416 U.S. at 7-8.  Nothing in those cases prevents state or federal authorities

from enacting statutory restrictions on the local exercise of zoning power, such as

the Fair Housing Act.  Bozeman cannot defeat summary judgment in this instance

by asserting a constitutional "right to zone."

Bozeman next argues the motion for summary judgment should fail because

the unlawful steering regulations require not only facial discrimination but also a

showing of discriminatory intent.  Bozeman's interpretation of the law is

supported by the language of 24 C.F.R. § 100.70, which prohibits restricting,

discouraging, or obstructing "because of ... handicap."  The language implies that

the discriminatory action must be the product of a discriminatory mental state and

not due to some non-invidious reason.  As the Seventh Circuit has stated in the

racial steering context, proof of a discriminatory effect is not conclusive proof of

an intent to steer:

> If a statement or act would have a discriminatory effect and is made
> with the intent to steer, it violates section 3604(a).  Expanding on this
> formulation, we hold that (1) a real estate broker who treats customers
> differently from one another because of their race violates Title VIII;
> (2) even without direct evidence of such difference in treatment, if the
> broker sells blacks houses in black neighborhoods and whites houses
> in white ones and he can offer no noninvidious reason (such as

customer preference) for this pattern, then an inference of disparate
treatment can be drawn from the discriminatory effect. But
discriminatory effect is not, as the challenged instruction conveyed,
the violation; it is merely evidence of violation.

Village of Bellwood v. Dwivedi, 895 F.2d 1521, 1533-34 (7th Cir. 1990) (internal

quotation marks omitted).

The city's Rule 30(b)(6) designee, Defendant Epple, makes the following

admissions in his deposition:

> Q:   Was it the policy or preference of the city that [assisted living
>      facilities] or elderly care facilities have more of a chance to be located
>      in those zoning districts rather than R-S, R-1, and R-2?
>
> A:   Yes.
>
> Q:   So, essentially, you were steering them into those zoning districts?
>
> A:   I think a reading of the code would say, yeah, you're steering them to
>      those districts.

Doc. No. 98-3 at 65.

Although these isolated statements by Defendant Epple given in the course

of his deposition may evidence discriminatory intent on the part of Bozeman, the

Court is unwilling, absent more evidence, to grant summary judgment on Fair

Housing's claim that Bozeman, as a matter of policy and practice, unlawfully

steers people with disabilities in violation of 42 U.S.C. § 3604(f)(1), and thus the

motion for summary judgment on this point is denied.

-18-

b.      The Household Definition Section

The Household Definition Section of the Ordinance defines "household" as:

A person living alone, or any of the following groups living together as a single nonprofit housekeeping unit and sharing common living, sleeping, cooking and eating facilities:

A.      Any number of people related by blood, marriage, adoption, guardianship or other duly-authorized custodial relationship;

B.      Not more than four unrelated people, including persons enrolled in an institution of higher learning;

C.      Two unrelated people and any children related to either of them; or

D.      Not more than four people who are:

      1.      Residents of a "Community Residential Facility" as defined in § 76-2-411 et seq., MCA and this title; or

      2.      "Handicapped" as defined in the Fair Housing Act, 42 USC § 3602(h).  This definition does not include those persons currently illegally using or addicted to a "controlled substance" as defined in the Controlled Substances Act, 21 USC § 802(6).

E.      "Household" does not include:

      1.      Any society, club, fraternity, sorority, association, lodge, combine, federation, coterie, cooperative housing or like organization;

      2.      Any group of individuals whose association is temporary or seasonal in nature; or

      3.      Any group of individuals who are in a group living arrangement as a result of criminal offenses.

Ordinance § 18.80.1390.

### i.      Is the Household Definition Section Facially Discriminatory?

Applying the standard for facial discrimination imposed by the federal acts and discussed in detail above, the Court concludes that the Household Definition Section is not facially discriminatory because it does not "appl[y] less favorably to a protected group." Community House, 490 F.3d at 1048.  Subsection (A) unambiguously allows "[a]ny number of people related by blood, marriage, adoption, guardianship or other ... custodial relationship" to comprise a household. Fair Housing argues that subsection (D)(2) expressly limits to four the number of handicapped people who may comprise a household, even if all inhabitants are related within the meaning of the Ordinance.  But subsections (A) through (D) of the Household Definition Section are listed disjunctively; the clear implication is that a common housekeeping unit meeting any one of those four subsections constitutes a household, regardless of whether it also meets the standard under the other subsections.  Put another way, nothing in subsection (D) suggests that it in any way modifies or limits the definition of "household" contained in subsection (A).

It may be argued that this interpretation begs the question of why

handicapped people are specifically regulated in subsection (D)(2), since subsection (B)'s blanket prohibition on groups of more than four unrelated people living together presumably extends to handicapped citizens.  But inartful drafting in the form of redundancy in the language of the Ordinance does not automatically render it facially discriminatory.  That there is no obvious explanation for the inclusion of a separate provision explicitly limiting to four the number of handicapped people who may comprise a household does not mean that the Court must adopt the most improbable explanation of all, i.e., that despite the plain language of subsection (A), a family with more than four members, all of whom are handicapped, are not a household for purposes of the Ordinance.

The Household Definition Section may be fairly described as redundant or confusing but it is not a fair characterization to say that it is discriminatory on its face.  Because subsection (A) of the statute does not treat groups of related disabled people any differently than any other related group of people, Fair Housing has failed to establish that the Household Definition Section is discriminatory on its face, and the motion for summary judgment on this point is denied.

ii.     Does the Household Definition Section Constitute a
Discriminatory Statement Under the Fair Housing
Act?

Fair Housing's claim that the Household Definition Section constitutes a

discriminatory statement is predicated on the success of its argument that the

section is facially discriminatory.  Because Fair Housing has failed to carry its

burden on summary judgment to show that an ordinary reader would find the

Household Definition Section discriminatory on its face, Fair Housing's motion

for summary judgment on its discriminatory statement claim is denied.[7]

## 2.     Does the Ordinance Violate the Montana Human Rights Act?
(Count VII)

Fair Housing alleges that the Authorized Uses Section and the Household

Definition Section also violate the Montana Human Rights Act because they are

facially discriminatory and because they constitute discriminatory statements.

These claims are conceptually similar to the federal statutory claims, except that

the Human Rights Act extends its prohibition to discrimination based on age and

marital status as well as disability.

---

[7]The Fair Housing Act's discriminatory statements provision makes it unlawful to "make, print, or publish, or cause to be made, printed, or published any notice, statement, or advertisement, with respect to the sale or rental of a dwelling that indicates any preference, limitation, or discrimination[.]"  42 U.S.C. § 3604(c).  The Court is not persuaded by the argument, advanced in Fair Housing's reply brief, that answers given by Bozeman's Rule 30(b)(6) designee in response questions put to him by opposing counsel at his deposition fall within the scope of statements meant to be regulated by that provision.

Mont. Code Ann. § 49-2-305(1)(d) makes it unlawful for any person to "make unavailable or deny a housing accommodation or property because of ... marital status, ... age, [or] ... physical or mental disability[.]"  Mont. Code Ann. § 49-2-305(3) makes it "an unlawful discriminatory practice to make, print, or publish or cause to be made, printed, or published any notice, statement, or advertisement that indicates any preference, limitation, or discrimination" described in § 49-2-305(1)(d).

> ### a.    Does the Authorized Uses Section Violate the Montana Human Rights Act?

Fair Housing contends the Authorized Uses Section violates the Human Rights Act because its it facially discriminatory against the disabled and the elderly and because it constitutes a discriminatory statement against those classes. Fair Housing relies on the same arguments it put forth in the context of the federal acts, i.e., the authorized uses table expressly excluding assisted living and elderly care facilities from certain districts is discriminatory on its face.  Bozeman also relies on the same arguments it presented in response to the federal claims, with the added contention that the Human Rights Act does not protect the elderly due to a federal statutory exemption.

i.      **Is the Authorized Uses Section Discriminatory
        Against the Disabled and the Elderly in Violation of
        Mont. Code Ann. § 49-2-305(1)(d)?**

For the same reasons discussed above, the Court finds the Authorized Uses

Section to be facially discriminatory against the disabled under Mont. Code. Ann.

§ 49-2-305(1)(d).  Moreover, because the elderly and the disabled receive

precisely the same treatment on the face of the Authorized Uses Section, the Court

extends its finding of facial discrimination to include age-based discrimination

under the state law.

Bozeman argues it is irrelevant whether the Authorized Uses Section

discriminates against the elderly because under 42 U.S.C. § 3607(b)(2)(C), the

protections of Mont. Code Ann. § 49-2-305(1)(d) do not apply to housing for

"older persons."  Bozeman's reliance on 42 U.S.C. § 3607(b)(2)(C) is unavailing.

The statute provides exemptions to the Fair Housing Act to "permit communities

satisfying certain requirements to discriminate on the basis of familial status."

Balvage v. Ryderwood Improvement and Service Association, Inc., 642 F.3d 765,

769 (9th Cir. 2011).  The statute also provides exemptions to the Human Rights

Act familial status and age requirements.  But the exemptions apply to only three

types of housing: (1) housing provided by state and federal programs that assist

elderly people; (2) housing intended for, and solely occupied by, people who are

62 years of age or older; and (3) housing for people 55 years old or older.  42

U.S.C. § 3607(b)(2)(A) – (C).  Because these categories are not inclusive of every

conceivable type of housing that might meet the Ordinance's definition of an

"elderly care facility,"[8] Bozeman's reliance on the federal statutory exemption

fails.

Having determined that the Authorized Uses Section is facially

discriminatory against people with disabilities and the elderly under the Human

Rights Act, the Court must make an additional determination.  Rule 24.9.610(5) of

the Administrative Rules of Montana provides the analysis a court must follow in

a direct evidence situation, such as that presented here.  Rule 24.9.610(5)

provides:

> If a [claimant] has established a prima facie case with direct evidence
> of unlawful discrimination ... the respondent must prove by a
> preponderance of the evidence that an unlawful motive played no role
> in the challenged action or that the direct evidence of discrimination
> is not credible and is unworthy of belief.

See also Hafner v. Conoco, Inc., 977 P.2d 330, 333-34 (Mont. 1999) (applying

Rule 24.9.610(5), Admin. R. Mont., in employment discrimination case based on

disability).

---

[8]For example, a private elder care facility that accepts residents aged 50 and above is not
exempt under 42 U.S.C. § 3607(b)(2)(A) – (C).

Bozeman does not challenge the direct evidence of discrimination as being not credible or unworthy of belief. Thus, the Court need determine only whether Bozeman has proven, by a preponderance of the evidence, "that an unlawful motive played no role in the challenged action[.]" Rule 24.9.610(5), Admin. R. Mont.

Bozeman argues that the Ordinance was enacted with the "legitimate, nondiscriminatory" purpose of "further[ing] its zoning goals and ... preserv[ing] the character of its neighborhoods." Doc. No. 114 at 31. In support of this position, Bozeman has filed the Affidavit of Chris Saunders (Doc. No 113), which contains an attachment setting forth part of Bozeman's "updated growth policy," known as the "Bozeman Community Plan." Doc. No. 113 at ¶ 15. According to Saunders' Affidavit, the plan, which was adopted June 1, 2009, "included a discussion of Bozeman's 'special needs populations,'" including people with disabilities and the elderly, and it "set forth a number of goals, including a review and revision of zoning ordinances." Id.

In light of Bozeman's proffered reasons for enacting the Ordinance and the discussion contained in the Bozeman Community Plan, the Court concludes that genuine issues of material fact preclude summary judgment on this claim. At this juncture and on the current record, the Court is unable to determine as a matter of

-26-

law whether Bozeman has proven, by a preponderance of the evidence, "that an unlawful motive played no role in the challenged action[.]"  Rule 24.9.610(5), Admin. R. Mont.  Thus, summary judgment is not appropriate and Fair Housing's motion on this point is denied.

> ii.   **Is the Authorized Uses Section a Discriminatory Statement in Violation of Mont. Code Ann. § 49-2-305(3)?**

Just as the Court concluded in the context of the federal Fair Housing Act, because the Authorized Uses Section is facially discriminatory against the elderly and the disabled, that section constitutes a discriminatory statement under the Montana Human Rights Act, Mont. Code Ann. § 49-2-305(3).  Fair Housing is therefore entitled to summary judgment in its favor on this claim.

> b.   **Does the Household Definition Section Violate the Montana Human Rights Act?**

Fair Housing contends the Household Definition Section violates the Human Rights Act because its it facially discriminatory against the disabled and the unmarried and because it constitutes a discriminatory statement against those classes.

### i.      Is the Household Definition Section Discriminatory Against the Disabled in Violation of the Human Rights Act?

Fair Housing relies on the same arguments it put forth in the context of the federal acts, i.e., the term "household" is defined to disallow more than four related people with disabilities.  Bozeman also relies on the same arguments it presented in response to the federal claims.  For the reasons already articulated in the Court's Fair Housing Act analysis, the Household Definition Section is not discriminatory on its face and therefore does not constitute a violation of Mont. Code Ann. § 49-2-305(1)(d) or a discriminatory statement under Mont. Code Ann. § 49-2-305(3) with respect to the disabled.

### ii.      Is the Household Definition Section Discriminatory Against the Unmarried in Violation of the Human Rights Act?

Fair Housing claims that the Household Definition Section discriminates based on martial status.  To support its contention Fair Housing points to (1) deposition testimony wherein Defendant Epple agreed with Fair Housing's counsel's characterization of the Household Definition Section as placing "a limitation on non-nuclear families"; and (2) Bozeman's practice of issuing notices of violation to households comprised of more than four unrelated people.  Doc. Nos. 98-3; 100-3; 100-4.  Neither of these supports a finding that the provision is

facially discriminatory.

Under Montana law, "marital status" encompasses not only the condition of being married, but also of being single, widowed, or divorced.  Thompson v. Board of Trustees, Sch. Dist. No. 12, 627 P.2d 1229, 1231 (Mont. 1981).  Even under this more expansive view of marital status, Bozeman's Ordinance does not facially discriminate based on marital status.  Subsection (C) defines "household" to include "[t]wo unrelated people and any children related to either of them." Couples are not treated less favorably whether married or unmarried.  Community House, 490 F.3d at 1048.  Thus, summary judgment on this claim is not warranted.

### 3.    Has Bozeman Failed to Engage in Affirmative Duties Required by the Montana Governmental Code of Fair Practices? (Count VIII)

#### a.    Mont. Code Ann. § 49-3-204

Bozeman has a statutory duty to take appropriate action to "assure equal treatment of all persons, eliminate discrimination, and enforce compliance" with the state's anti-discrimination policies.  Mont. Code Ann. § § 49-3-204.  Fair Housing argues Bozeman has failed to perform that duty.  The record contains evidence from which it could be concluded that Bozeman took the requisite action, including: (1) Bozeman's City Commission had the definition of "family" studied and ultimately changed, Doc. No. 111 at ¶¶ 4-6; (2) Bozeman's City Commission

-29-

requested its planning staff review the zoning ordinance, resulting in changes, id. at ¶¶ 8-10; and (3) Bozeman adopted the Ordinance in 2003 following review of the zoning ordinance, public hearings, public input, and review of drafts by retained outside counsel, id. at ¶¶ 11-12.

Fair Housing also argues in its reply brief that Bozeman violated § 49-3-204 by "failing to take appropriate action in the exercise of its licensing and regulatory powers to 'eliminate discrimination' against persons with disabilities at the Hinesley Properties." Doc. No. 123 at 10-11.  Because Bozeman has not had an opportunity to respond this specific argument, raised for the first time on reply, the Court declines to address it here.  Zamani, 491 F.3d at 997.  Fair Housing's motion for summary judgment is denied on this claim due to the existence of genuine issues of material fact.

### b.   Mont. Code Ann. § 49-3-205

State law also imposes upon Bozeman a duty under Mont. Code. Ann. § 49-3-205 to "analyze all of its operations to ascertain possible instances of noncompliance[]" with state anti-discrimination policies.  Bozeman has presented evidence that its Building Department reviews its enforcement of the building code on a daily basis and that it has changed its policies from time to time as a result of those reviews.  Doc. No. 111 at ¶ 20.  Thus, summary judgment on this

claim is not appropriate.

## IV.  Order

Based on the foregoing, IT IS HEREBY ORDERED that Fair Housing's

motion for summary judgment (Doc. No. 92) is GRANTED in part and DENIED

in part as set forth above.

IT IS FURTHER ORDERED pursuant to Paragraph 2 of the Second

Amended Scheduling Order (Doc. No. 87) that a telephonic scheduling conference

is set for March 6, 2012, at 10:00 a.m.  At that time the parties are to call 888-684-

8852, and if prompted for a security code or access code to enter 8736350.

Dated this 28th day of February, 2012.


Dana L. Christensen, District Judge
United States District Court